UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA

    -against-                                        NOTICE OF MOTION TO
                                                        DISMISS

KARA STERNQUIST
                                                        22-cr-473


--------------------------------------------------------X


PLEASE TAKE NOTICE, that the defendant **Kara Sternquist**, by her attorney **Allegra Glashausser**, of the Federal Defenders of New York, and upon the accompanying memorandum of law, will move the Court, before the Honorable Dora L. Irizzary, United States District Judge for the Eastern District of New York, for an Order:

1.      Dismissing the charge under 18 U.S.C. § 922(g) in the indictment; and

2.      Granting such other and further relief as the Court may deem just and proper.


DATED:    BROOKLYN, N.Y.

          May 30, 2023


                        /s/

             Allegra Glashausser

             Attorney for Ms. Kara Sternquist
             Federal Defenders of New York
             1 Pierrepont Plaza, 16th Floor
             Brooklyn, N.Y. 11201
             (212) 417-8739

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA

    -against-

KARA STERNQUIST

                                         22-cr-473

-------------------------------------------------------X


## Memorandum of Law in Support of
## Kara Sternquist's Motion to Dismiss

Allegra Glashausser
Attorney for Ms. Kara Sternquist
Federal Defenders of New York
1 Pierrepont Plaza, 16th Floor
Brooklyn, N.Y. 11201
(212) 417-8734

Kara Sternquist was charged with possessing a gun after having a prior felony conviction, under 18 U.S.C. § 922(g)(1). The charged gun was found in a large, apartment that was crammed with things, including collections of other gun parts, home-made leather goods, such as purses and belts, and intricate costumes. There were bags of keychains, coins, and plastic flowers; piles of discarded keys, business cards, and old electronics. There were countless boxes of dried foods, containers of bottled water, and medical supplies. Despite the sheer volume of items in the apartment, there was not one piece of ammunition.

Ms. Sternquist's prior felony convictions were non-violent, under any definition of the word "violent." In 2003, she was convicted of theft; in 2006, she was convicted of identity fraud; and, in 2010, she was convicted of possession of counterfeiting tools. *See* Pretrial Report. She also had prior misdemeanor convictions; those too were not violent. Ms. Sternquist's non-violent record should have nothing to do with her Second Amendment rights. That she was convicted of identity fraud, theft, or having counterfeiting tools should have nothing to do with her right to possess guns.

This Court should, therefore, find that Section 922(g)(1) improperly infringes on Ms. Sternquist's Second Amendment rights and that the gun charge against her should be dismissed. *See* U.S. Const., II Amend.; Federal Rule of Criminal Procedure 12(b); *New York State Rifle & Piston Association v. Bruen*, 142 S. Ct. 2111 (2022).

## Argument

### There is no historical tradition banning people with non-violent felony convictions from owning guns, therefore, Kara Sternquist is part of the "people," who have the constitutional right to "bear arms."

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Second Amendment right is "fundamental to our scheme of ordered liberty" that cannot be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 767, 780 (2010). Second Amendment rights are as important and deserving of protection as all enumerated constitutional rights, which "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129–30. Here, Ms. Sternquist and her alleged conduct fall squarely within the Second Amendment's plain text. Ms. Sternquist is a member of the "people" protected by the Second Amendment, and the gun she is accused of possessing, described in the indictment as a black 9 millimeter pistol, is within the scope of "arms" to which the Second Amendment indisputably applies. *See Heller*, 554 U.S. at 628 (rejecting argument that

2

the Second Amendment only protected the right to have guns related to preserving a militia). As such, the possession of guns by people with felony convictions, like Ms. Sternquist, is presumptively covered by the Second Amendment. This is particularly true as Ms. Sternquist's only prior felony convictions are for non-violent, fraud and theft-related crimes. She has never committed a violent felony. Her convictions, which have nothing to do with guns or violence, have no logical relationship to a prohibition on possessing guns.

To justify a wholesale withdrawal of Second Amendment rights, the government must demonstrate a narrow, well-defined historical tradition of distinctly similar prohibitions at or near the time the Second Amendment was ratified in 1791. There is no such historical tradition. Thus, neither the text of the Second Amendment nor historical tradition allow the complete lifetime prohibition on the possession of guns by Ms. Sternquist. For these reasons, as explained below, section 922(g)(1) is unconstitutional. This is particularly true as applied to Ms. Sternquist, who is not dangerous and has no violent convictions. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (the "dispossession of all felons—both violent and nonviolent—is unconstitutional as applied to Kanter, who was convicted of mail fraud."). Accordingly, the charge against her under section 922(g)(1) should be dismissed.

I.    The *Bruen* historical inquiry framework to Second Amendment challenges.

Last term, the Supreme Court emphatically repudiated the trend among lower courts to "defer[ ] to legislative interest balancing" when scrutinizing firearms regulations. *See Bruen*, 142 S. Ct. at 2121. In *Bruen*, the Supreme Court emphasized that a gun regulation is constitutional only if it conforms to the Second Amendment's text and this nation's historical tradition. *Id.* at 2127, 2129–30. Following *Bruen*, courts across the country have reconsidered and held unconstitutional numerous firearms regulations that cannot satisfy the rigorous analysis mandated by the Supreme Court. *See United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) (finding that statute prohibiting possession of guns by someone subject to a domestic violence restraining order is unconstitutional); *United States v. Perez-Gallan*, 22 Cr. 427 (DC), 2022 WL 16858516 (W.D. Tex. Nov. 10, 2022) (same); *United States v. Connelly*, No. EP-22-CR-229(2)-KC, 2023 WL 2806324 (W.D. Tex. Apr. 6, 2023) (statute prohibiting possession of guns by an unlawful user of a controlled substance is unconstitutional); *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) (same). *See also United States v. Hicks*, No. W:21-CR-00060-ADA, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) (federal statute prohibiting receipt of firearm while under felony indictment violated Second Amendment); *Firearms Policy Coal. v. McCraw*, 21 Civ. 1245, 2022 WL 3656996, at *5 (N.D. Tex. Aug. 25, 2022) (holding that statute limiting gun ownership to people over 21 was not "consistent" with the nation's "historical tradition);

In 2022, the Supreme Court invalidated the prior framework for adjudicating Second Amendment challenges that the Second Circuit and other courts had used and provided detailed instructions on how lower courts should resolve such claims going forward. In *Bruen*, the Supreme Court explained that "the standard for applying the Second Amendment is as follows":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2129–30 (internal quotation marks omitted).

The Supreme Court then identified two different classes of gun regulations, each demanding a distinct analytical approach. First, when analyzing a regulation directed at "a general societal problem that has persisted since the 18th century," courts must conduct a "straightforward historical inquiry." *Id.* at 2131. In this analysis, the government bears the burden of identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* at 2137–38; *see id.* at 2150 (holding that it is the burden of the government to "sift the historical materials for evidence" to sustain the regulation at issue).

Relevant evidence that a modern regulation is unconstitutional includes "the lack of a distinctly similar historical regulation," earlier generations' attempts to

regulate the conduct at issue "by materially different means," or the rejection of "analogous regulations" at the time of the founding. *Id.* at 2137–38. Essentially, if "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional. *See id.*

Second, courts may resort to a "more nuanced" form of "analogical reasoning" only when a challenged regulation implicates "unprecedented societal concerns or dramatic technological changes." *See id.* at 2132. Under this second approach, the government must "identify a well-established and representative historical *analogue*, not a historical twin." *Id.* at 2133. This type of analogical reasoning only applies to "modern regulations that were unimaginable at the founding." *Id.* at 2132.

Here, the first approach applies. Ms. Sternquist is charged with violating 18 U.S.C. § 922(g)(1), which prohibits people with any type of felony conviction – including non-violent convictions like Ms. Sternquist's fraud and theft crimes – from possessing a gun under all circumstances, including within the home, for defense of the home. The "problem" Congress sought to address with that law, the possession of guns by people with felony convictions, is a "general societal problem that has persisted since the 18th century." *See Bruen*, 142 S. Ct. at 2131. Therefore, under *Bruen's* analytical framework, it is the government's burden to identify a tradition of "distinctly" similar founding-era regulations. *See id.*

6

Because no such historical tradition exists, *infra,* prosecuting Ms. Sternquist under section 922(g)(1) violates her constitutional rights.

## II.   The right to bear arms "belongs to all Americans," including Ms. Sternquist.

Nowhere does the Second Amendment circumscribe "the people" whose rights it guarantees. *See* U.S. Const. amend. II. In *Heller*, the Supreme Court canvassed the constitutional text and historical record and held that the Second Amendment codified a pre-existing "individual right to keep and bear arms" that "belongs to all Americans." 554 U.S. at 581, 592. The Court stated that there is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. As used in the Second Amendment, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. That right is as important and deserving of protection as all enumerated constitutional rights, which "are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 634–35.

As the Supreme Court noted in its "textual analysis" of the Second Amendment's "operative clause," the phrase "the right of the people" also appears in the First and Fourth Amendments, *Heller*, 554 U.S. at 580, and "the people" by whom rights are retained or reserved also appears in the Ninth and Tenth Amendments. *See* U.S. Const. amend. I ("the right of the people to peaceably assemble, and to petition

7

the Government for a redress of grievances"); *id.* amend. IV ("the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures"); *id.* amend. IX (unenumerated rights "retained by the people"); *id.* amend. X (non-delegated rights "reserved to the States respectively, or to the people"). As used in the Bill of Rights, "the people" thus has one unitary meaning: it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 579–81 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). The phrase "the people" thus creates "a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. Indeed, *Bruen* cites *Heller* as stating, "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions.'" *Bruen*, 142 S. Ct. at 2156.

To read "the people" protected by the Second Amendment as excluding persons convicted of non-violent felonies would be contrary to text and at odds with the cardinal rule of statutory interpretation that "identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). The untenable result would be to single out the Second Amendment for "specially unfavorable treatment." *See McDonald*, 561 U.S. at 780. The Founders, for example, certainly did not conceive that people with felony

convictions could be searched and seized unreasonably or prevented from peaceably assembling. *See Verdugo-Urquidez*, 494 U.S. at 265 (holding that the same "people" are protected by the First, Second, Fourth, Ninth, and Tenth Amendments). Now-Justice Barrett, reading *Heller* to interpret "'the people' as referring to 'all Americans,'" rejected the notion that felons are "categorically excluded from our national community." *Kanter v. Barr*, 919 F.3d 437, 451–53 (7th Cir. 2019) (Barrett, J., dissenting).

There is also no historical evidence that Founding-era legislators considered people with non-violent felony convictions to be outside the Second Amendment's protections. Contemporary dictionaries define "people" as "those who compose a community," extending to "every person" who lives within a country or nation. *See, e.g.*, Ex. A, 2 Samuel Johnson, *A Dictionary of the English Language* (1766) (defining "people" as "a nation; those who compose a community"); Ex. B, Thomas Dyche & William Pardon, *A New General English Dictionary* (14th ed. 1771) (defining "people" as "every person, or the whole collection of inhabitants in a nation or kingdom"); Ex. C, Nathan Bailey, *A Universal Etymological English Dictionary* (1790) (defining "people" as "the whole Body of Persons who live in a Country, or make up a Nation"); Ex. D, John Ash, *The New and Complete Dictionary of the English Language* (2d ed. 1795) (defining "people" as "a nation, the individuals composing a community; the commonalty, the bulk of a nation, persons of a particular class; persons in general"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "people" as "the body of

persons who compose a community, town, city or nation . . . In this sense, the word is not used in the plural, but it comprehends all classes of inhabitants, considered as a collective body, or any portion of the inhabitants of a city or country"), available at https://webstersdictionary1828.com/Dictionary/people.

Contemporary legislation agrees. The *Heller* Court explained that "the Second Amendment's prefatory clause"—"A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given that "stated purpose, logic demands that if an individual was (or is) a member of the 'militia,' the Second Amendment's protections extend at least to those who constitute the militia." *McCraw*, 2022 WL 3656996, at *5. In the first Militia Act, enacted one year after the Second Amendment's ratification, Congress provided that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia." Act of May 8, 1792, § 1, 1 Stat. 271. The Act further stipulated that "every citizen so enrolled . . . shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements. *Id.* Although the Act "exempted" certain classes of people from its requirements, such as "custom-house officers" and "ferrymen employed at any ferry on the post road," people with felony convictions were not among those excluded. *Id.* § 2, 1 Stat. 272.

10

As the Militia Act makes clear, at the time of the Founding (and the Second Amendment's adoption), people with felony convictions were not only permitted to possess firearms, they were legally required to do so in some circumstances. Given this legal obligation, holding that such people now lack Second Amendment rights would be textually and historically untenable. *See McCraw*, 2022 WL 3656996, at *5 ("It would be illogical to enumerate a constitutional right to keep and bear arms to maintain an armed militia if that right did not protect those individuals from whom a militia would be drawn").

That the Supreme Court has occasionally used the phrase "law-abiding citizens" when referring to the scope of Second Amendment rights does not affect this analysis. As the *Heller* Court explained, "*whatever else it leaves to future evaluation*, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). This language establishes a constitutional floor, not a ceiling; it sets out that law-abiding citizens *are* protected by the Second Amendment, not that people with felony convictions are *not* protected.[1]

---

[1] This Court should not follow the (now-vacated) panel decision from the Third Circuit that those convicted of offenses punishable by more than a year of imprisonment are not part of "the people." *See Range v. Atty. Gen.*, 53 F.4th 262 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). As described *infra*, the Third Circuit panel erroneously employed the "analogical reasoning" approach that the *Bruen* Court limited to "distinctly modern firearm regulation[s]," not the "distinctly similar historical regulation" standard mandated for "general societal problem[s] that ha[ve] persisted since the 18th century." *See Range*, 53 F.4th at 270–71. This fundamental error warped the panel's analysis, permitting the government to defend section 922(g)(1) based on insufficiently similar historical regulations.

In addition to being at odds with authority, text, and established canons of construction, defining "the people" whom the Second Amendment protects by reference to a vague and malleable "law abiding" standard suffers from a lack of administrability and necessarily involves the very "interest-balancing" *Bruen* emphatically rejected. *See* 142 S. Ct. at 2129–31; *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) ("To say that certain people fall outside the Amendment's scope" means that "a person could be in one day and out the next."); *Perez-Gallan*, 2022 WL 16858516, at *9 (holding section 922(g)(8) unconstitutional and noting that restricting "the people" to "law-abiding" persons could absurdly strip Second Amendment rights from the speeding driver and the shop-owner who forgets to put out a "wet floor" sign).

In sum, people with felony convictions do not lose their status as "people" under the Constitution. The Second Amendment, rather, "belongs to all Americans." *Heller*, 554 U.S. at 581; *accord Bruen*, 142 S. Ct. at 2156. Just as it does not "draw . . . a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, the Constitution does not draw a felon/non-felon distinction. Had the Founders intended the Second Amendment's use of "the people" to refer only to "law-abiding" persons, they would have said so. That they did not, and that they used the same "the people" language as in the First, Fourth, Ninth, and Tenth Amendments, demonstrates that people with felony convictions were considered part of "the people" in the Founding era.

12

Thus, Ms. Sternquist's alleged conduct is plainly covered by the text of the

Second Amendment and is "presumptively protected" on constitutional grounds.

## III.    There is no historical tradition of banning people with non-violent felony convictions from possessing guns.

Because the Second Amendment's plain text covers Ms. Sternquist's alleged

conduct, the burden is on the government to establish that section 922(g)(1) "is

consistent with the Nation's historical tradition of firearm regulation" based on

evidence at or near the time of the Second Amendment's ratification in 1791. *Bruen*,

142 S. Ct. at 2129–30. It cannot do so.

### a.    *Bruen's* "straightforward historical analysis" test applies

Courts faced with a *Bruen* challenge must identify at the outset the problem at

which a statute is aimed, and then determine whether it existed in 1791 or instead

grows out of "unprecedented" societal changes or "dramatic technological" changes.

*Id.* at 2132. The "problem" of people with felony convictions possessing guns is not

new to modern America. On the contrary, in the Founding era, a substantial number

of Americans had previously been convicted of felonies. For example, between 1700

and 1775, approximately 52,200 convicts were sent to the 13 colonies. *See*

Encyclopedia Virginia, "Convict Labor during the Colonial Period," *available at*

encyclopediavirginia.org/entries/convict-labor-during-the-colonial-period/ (last

accessed May 30, 2023). There were also laws aimed to exclude some people from

13

having guns in that time-period, but these laws were race-based, rather than based on a person's criminal record. *See, e.g.*, Adam Winkler, Essay, *Racist Gun Laws and the Second Amendment*, 135 HARV. L. REV. F. 537 (2022); *Dred Scott v. Sandford*, 60 U.S. 393, 417, 15 L. Ed. 691 (1857) (in holding that Black people could not be citizens, noting that would mean they could "keep and carry arms wherever they went"); *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) ("Slaves and Native Americans, on the other hand, were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course."). The question of whether people with felony convictions should be allowed to possess guns, therefore, is not "unimaginable" or "unprecedented," but, instead, "a general societal problem that has persisted since the 18th century." *See Bruen*, 142 S. Ct. at 2137–38.

As the Supreme Court made clear, such "general societal problems" must be analyzed utilizing a strict test. Rather than engaging in the "analogical reasoning" reserved for novel issues, the Court must instead conduct a "straightforward historical analysis," and, for a firearms regulation to survive, the government must demonstrate a tradition of "distinctly similar historical regulation[s]" from the Founding era. *Id.* A "tradition" of regulation requires more than one or two isolated examples. It demands a robust, "widespread" historical practice "broadly prohibiting" the conduct in question. *See id.* Although the *Bruen* Court did not define what constitutes a "tradition," it did hold that "a single law in a single State" is insufficient and doubted that regulations of three of the thirteen colonies "could suffice." *Id.* at 2142–45

14

(noting that the three colonial regulations the government identified were not analogous to the challenged New York public-carry restriction).

Similarly, while *Bruen* did not define "distinctly similar," its analysis demonstrates that the standard is a stringent one. The only historical regulation *Bruen* identified as sufficiently similar to the New York law *Bruen* invalidated was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.* at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's standard. *See id.* at 2123–24 & n.2. A "distinctly similar" regulation to section 922(g)(1) therefore would be one that either substantially abridged the right to keep and bear arms by those convicted of felonies or permanently denied firearms to some group very similar to felons (e.g., those convicted of some subset of crimes).[2]

---

[2]     The vacated panel decision in *Range* reflected, *inter alia*, two fundamental methodological flaws at these steps of the required analysis. First, as noted, the access to firearms by those convicted of felonies has posed a (potential) "societal problem" since well before 1791. Therefore, the government was required to identify a "distinctly similar" Founding-era regulation. But the panel skipped the "distinctly similar" test without mentioning it and did not identify a single Founding-era law barring people with felony convictions from possessing a firearm (because none exist, *see infra*). *Range*, 53 F.4th at 274–82. Instead, the panel applied the less rigorous "relevantly similar" rubric and analogized section 922(g)(1) to purported historical regulations it described at extremely high levels of generality, such as measures disarming people who "evince[d] a disrespect for the rule of law." *Id.* at 282. Defining a historical tradition at that level of generality is inconsistent with *Bruen*'s demand for "distinctly similar" precursors. *See* 142 S. Ct. at 2131.

b.   There is no American historical tradition of banning people with felony convictions from possessing firearms

When it comes to the Second Amendment, "not all history is created equal." *Bruen*, 142 S. Ct. at 2136. The Supreme Court has given almost no weight to twentieth-century laws and has found that late-nineteenth century laws have an unacceptable "temporal distance from the founding." *Id.* at 2154. Moreover, regardless of the historical record, the Second Amendment's text is always paramount: post-ratification laws that "are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quotations and emphasis omitted).

Although it is the government's burden to prove a Founding-era tradition of permanently barring people with felony convictions from possessing guns, the simple truth, as now-Justice Barrett noted in 2019, is that "scholars have been unable to identify" any Founding-era felon-disarmament laws. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting). That is because none exist. *See, e.g.*, Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous,"* 25 TEX. REV. L. & POL. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were "deprived of firearm rights" at the Founding). Robert H. Churchill, a history professor at the University of Hartford, has taken "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." Robert H. Churchill, *Gun Regulation,*

16

*the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 143 & n.11 (2007). Based on that survey, Professor Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic." *Id.* at 142. Carlton Larson, a professor at the University of California-Davis School of Law, has similarly found that "state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 HASTINGS L.J. 1371, 1376 (2009). As another commentator has noted, while it is difficult "to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009).

Founding-era state legislatures had it in their power to disarm disfavored groups when they wanted. This historical record is stained with examples of Founding-era "legislatures [that] categorically disarmed groups whom they judged to be a threat to the public safety," such as Black people and Native Americans. *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); *see also* Adam Winkler, Essay, *Racist Gun Laws and the Second Amendment*, 135 HARV. L. REV. F. 537 (2022). Notably, Ms. Sternquist also would not fall into the category of being a "threat to the public safety." As in

17

*Kantor*, where Justice Barrett, then-Judge Barrett, dissented, noting that a person with a non-violent felony conviction should not be permanently deprived of his Second Amendment rights, there is no evidence Ms. Sternquist "would be dangerous if armed," based on her criminal history. 919 F.3d at 468-69. On the contrary, nothing about her fraud and theft-related felony convictions suggest she was a threat to safety.

No legislatures barred people with felony convictions from possessing guns. That state legislatures had the power to disarm people with felony convictions, but did not do so, belies any attempt the government may make to claim a "historical tradition" of felon-disarmament.

During debates over the ratification of the Second Amendment, the concept of felon-disarmament gained no traction in the state legislatures. Only three state legislatures introduced proposals that would limit the scope of the Second Amendment's right to bear arms. Of those three, only New Hampshire's sought to withdraw the right to bear arms, not from "felons" as a class, but only from people who "are or have been in actual rebellion." *Kanter*, 919 F.3d at 454–55 (Barrett, J., dissenting); *see* 1 Jonathan Elliot, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d Ed. 1891). Pennsylvania's ratifying convention considered and *rejected* a proposal to withhold the right to bear arms from individuals with criminal convictions. 2 Bernard Schwartz, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 658, 660 (1971). "[N]one

of the relevant limiting language made its way into the Second Amendment." *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting).

There is, in sum, no Founding-era "historical tradition" of firearms regulations "distinctly similar" to section 922(g)(1). The "Founders themselves could have adopted" laws like section 922(g)(1) to "confront" the "perceived societal problem" posed by access to firearms by those convicted of felonies. *See Bruen*, 142 S. Ct. at 2131. That they refused to do so demonstrates that section 922(g)(1) "[i]s unconstitutional." *Id.*

Felon-disarmament laws like section 922(g)(1) are, instead, a modern innovation. That is particularly true for non-violent felonies. The "Federal Firearms Act," the precursor to section 922(g)(1) and the first federal felon-disarmament law, was not enacted until 1938, "147 years after the states ratified the Second Amendment." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). In its initial form, that law only barred receipt of a firearm and only by those convicted of "a few violent offenses." *Id.* The law was not extended to cover all people with felony convictions until 1961 and not amended to bar simple possession (rather than receipt) until 1968. *Id.* Thus, Ms. Sternquist's non-violent felony convictions were not part of the first federal felon-disarmament law.

Nor did felon-disarmament laws exist in the states until the twentieth century. It was not until 1917 that New York became the first state to prohibit people with felony convictions from owning firearms. *See* Ex. E, 1917 N.Y. Laws at 1643–45

19

(establishing that "[t]he conviction of a licensee of a felony in any part of the state shall operate as a revocation of the license"). After New York's 1917 revocation provision, no other state passed a felon-disarmament law until 1923. *See* Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 WASH. U. L. REV. 1187, 1211 (2015) ("[P]rohibitions on the possession of firearms by convicted felons emerged early in the twentieth century in response to a crime wave following the First World War."); *see also* Adam Winkler, *Heller's Catch-22*, 56 UCLA L. REV. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding"); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. REV. 1343, 1357 (2009) (noting "the absence of historical support for the claim that [felon-disarmament laws] are consistent with the preexisting right to arms").

This historical absence of felon-disarmament laws until the twentieth century is fatal to any argument the government might make regarding a Founding-era historical tradition of regulations "distinctly similar" to section 922(g)(1). These more modern provisions are simply insufficient to overcome the presumption of unconstitutionality that attaches to § 922(g)(1). *See Bruen*, 142 S. Ct. at 2154 (treating twentieth-century regulations as carrying practically no weight in the Second Amendment analysis).[3]

---

[3]     In considering any historical examples the government might identify, courts must be mindful of *Bruen*'s instruction that, in carving out exceptions to "the Second Amendment's unqualified command," 142 S. Ct. at 2126, courts should proceed cautiously, defining those exceptions narrowly and concretely to ensure they are in fact consistent with America's historical tradition of firearm regulation. In *Bruen*, the Supreme Court rejected New York's argument that its

## IV. *Bruen* abrogated prior case law relying on "presumptively lawful" exceptions to the second amendment.

In attempting to insulate a clearly unconstitutional law from the analytical scrutiny mandated by *Bruen*, the government might point to the Supreme Court's dicta that "longstanding prohibitions" on people with felony convictions possessing firearms are "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26. Similarly, the government might point to *Bruen*'s references to "law-abiding" citizens. *See* 142 S. Ct. at 2128–29. But this dicta, which briefly discussed an issue not before the Supreme Court, does not obviate the need for all lower courts considering challenges to firearms regulations to engage in the independent analysis *Bruen* demands.

*Heller* had nothing to do with the lawfulness of felon-disarmament statutes. The issue before the Supreme Court was whether the District of Columbia's blanket handgun ban was constitutional. In confirming that the right to bear arms is an individual right, the Court cautioned that the right is "not unlimited" and provided a non-exhaustive list of "presumptively lawful regulatory measures" in a footnote. *Heller*, 554 U.S. at 626–27 & n.26. Those measures included laws restricting possession by people with felony convictions and the mentally ill, as well as the carrying of firearms in "sensitive places." *Id.*

---

collection of discrete historical regulations amounted to a tradition of broadly prohibiting public carry, or of conditioning it on a special need for self-defense. *Id.* at 2156. From the fact that founding-era laws prohibited "particular mode[s]" of public carry, the Court declined to conclude that legislatures may enact a "*general* prohibition" on all modes of public carry or may "ban public carry altogether." *Id.* at 2146–47 & n.19 (emphasis altered).

But the Supreme Court emphasized that, in reaching its holding, "we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment." *Id.* at 626. *Heller* was the Court's "first in-depth examination of the Second Amendment," and the Court reiterated that it could not "clarify the entire field." *Id.* at 635. Notably, it promised that there would be "time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.*

*Bruen* subsequently demonstrated that the "presumptively lawful regulatory measures" the Supreme Court referenced in *Heller* were merely that: presumptive and in need of deeper analysis. Among the presumptively lawful measures *Heller* cited were "prohibitions on carrying concealed weapons," which "the majority of the 19th-century courts" had held were "lawful under the Second Amendment or state analogues." 554 U.S. at 626. In *Bruen*, however, the Supreme Court undertook an "exhaustive historical analysis" of a state licensing regime regulating, among other things, the concealed carrying of firearms. *See* 142 S. Ct. at 2156. It ultimately concluded that states in fact could *not* issue a blanket prohibition on concealed carry, notwithstanding *Heller*'s dicta to the contrary. *Id.* In deeming one of *Heller*'s "presumptively lawful" measures to be unconstitutional, the *Bruen* Court did what *Heller* demanded: it conducted an "exhaustive historical analysis" of one of the "exceptions" that had now "come before it." *Heller*, 554 U.S. at 635. The Court thus demonstrated that *Heller*'s preliminary list of Second Amendment exceptions was not

binding on future courts and did not prevent them from conducting a full historical review that might point to a different conclusion. As such, pre-*Bruen* decisions treating *Heller*'s "presumptively lawful" list as dispositive are no longer good law. *See, e.g.*, *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) (*per curiam*). Instead, this Court must undertake an "exhaustive historical analysis" to determine the constitutionality of section 922(g)(1) in the first instance.

The *Heller* Court made an important observation about how lower courts should interpret the scope of the Second Amendment: "[i]t is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon . . . footnoted dictum in a case where the point was not at issue and was not argued." 554 U.S. at 625 n.25. *Heller*'s reference to "presumptively lawful regulatory measures" is just such dictum: a passing reference, confined to a footnote, regarding an issue not raised or argued. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 686–87 (6th Cir. 2016) (*en banc*) (describing *Heller*'s "presumptively lawful" language as "dictum" and remanding, holding that permanent disarmament under Section 922(4) based on being in a mental institution "plausibl[y]" violated Second Amendment rights); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (same). It is not dispositive of this Court's independent determination of whether section

922(g)(1) is, in fact, consistent with our nation's history and traditions.[4] This analysis leads ineluctably to the conclusion that it is not.

## Conclusion

For the foregoing reasons, this Court should hold that section 922(g)(1) is unconstitutional both on its face, and as applied to Ms. Sternquist, who is not dangerous and has no violent felony convictions. Accordingly, the charge under section 922(g)(1) should be dismissed.

Dated:       May 30, 2023                Respectfully submitted,
             Brooklyn, New York
                                         By: /s/ Allegra Glashausser
                                         Allegra Glashausser

                                         Attorney for Ms. Kara Sternquist
                                         Federal Defenders of New York, Inc.
                                         1 Pierrepont Plaza, 16th Floor
                                         Brooklyn, N.Y. 11201
                                         (212) 417-8739

---

[4]    Similarly, while *Bruen* employed the phrase "law-abiding citizens" in various contexts, the actual text of the Second Amendment does not and *Bruen* prescribes a "methodology centered on constitutional text and history." 142 S. Ct. at 2128–29. As discussed, *Heller* has already construed the text and nothing in *Bruen*'s references to "law-abiding citizens" can be read as rejecting *Heller*'s interpretation of "the people."

# Exhibit A

PEN      PEO      PEP

PENTAM'ETER, a. Having five metrical feet. *Warton.*

PENTAN'DER, n. [Gr. πεντε, five, and ανηρ, a male.]

In *botany*, a plant having five stamens.

PENTAN'DRIAN, a. Having five stamens.

PENTAN'GULAR, a. [Gr. πεντε, five, and *angular.*] Having five corners or angles. *Grew.*

PENTAPET'ALOUS, a. [Gr. πεντε, five, and πεταλον, a petal.]

Having five petals or flower leaves. *Encyc.*

PENTAPH'YLLOUS, a. [Gr. πεντε, five, and φυλλον, a leaf.] Having five leaves.

PEN'TARCHY, n. [Gr. πεντε, five, and αρχη, rule.]

A government in the hands of five persons. *Brewer.*

PEN'TASPAST, n. [Gr. πεντε, five, and σπαω, to draw.]

An engine with five pulleys. *Dict.*

PEN'TASPERM'OUS, a. [Gr. πεντε, five, and σπερμα, seed.] Containing five seeds. *Encyc.*

PEN'TASTICH, n. [Gr. πεντε, five, and στιχος, verse.]

A composition consisting of five verses. *Dict.*

PEN'TASTYLE, a. [Gr. πεντε, five, and στυλος, a column.]

In *architecture*, a work containing five rows of columns.

PEN'TATEUCH, n. [Gr. πεντε, five, and τευχος, a book or composition.]

The first five books of the Old Testament.

PEN'TECONTER, n. [from the Greek.] A Grecian vessel of fifty oars, smaller than a trireme. *Milford.*

PEN'TECOST, n. [Gr. πεντηκοστη, πεντηκοντα, fiftieth.]

1. A solemn festival of the Jews, so called because celebrated on the fiftieth day after the sixteenth of Nisan, which was the second day of the passover. It was called the *feast of weeks*, because it was celebrated seven weeks after the passover. It was instituted to oblige the people to repair to the temple of the Lord, there to acknowledge his absolute dominion over the country, and offer him the first fruits of their harvest ; also that they might call to mind and give thanks to God for the law which he had given them at Sinai on the fiftieth day from their departure from Egypt. *Calmet. Encyc.*

2. Whitsuntide, a solemn feast of the church, held in commemoration of the descent of the Holy Spirit on the apostles. Acts ii.

PEN'TECOSTAL, a. Pertaining to Whitsuntide. *Sanderson.*

PEN'TECOS'TALS, n. Oblations formerly made by parishioners to the parish priest at the feast of Pentecost, and sometimes by inferior churches to the mother church. *Cowel.*

PENT'HOUSE, n. [Fr. *pente,* a slope, and *house.* In Welsh, *penty.*]

A shed standing aslope from the main wall or building.

PEN'TICE, n. [It. *pendice,* a declivity, from L. *pendo,* to bend.]

A sloping roof. [*Little used.*] *Wotton.*

PEN'TILE, n. [Fr. *pente,* a bending, and *tile.*]

A tile for covering the sloping part of a roof. [Qu. *pantile.*] *Johnson.*

PEN'TREMITE, n. A genus of zoophytes or fossil shells.

PENULT', n. [L. *penultimus ; pene,* almost, and *ultimus,* last.]

The last syllable of a word except one.

PENULTIMATE, a. [supra.] The last but one ; a word used of the last syllable of a word except one. It may be sometimes used as a noun.

PENUM'BRA, n. [L. *pene,* almost, and *umbra,* shade.]

In *astronomy,* a partial shade or obscurity on the margin of the perfect shade in an eclipse, or between the perfect shade, where the light is entirely intercepted, and the full light. *Cyc.*

PENU'RIOUS, a. [It. *penurioso,* from L. *penuria,* scarcity, want ; Gr. πεινη, poor; σπανις, rare.]

1. Excessively saving or sparing in the use of money ; parsimonious to a fault ; sordid ; as a *penurious* man. It expresses somewhat less than *niggardly.*

2. Scanty ; affording little ; as a *penurious* spring. *Addison.*

PENU'RIOUSLY, adv. In a saving or parsimonious manner ; with scanty supply.

PENU'RIOUSNESS, n. Parsimony ; a sordid disposition to save money. *Addison.*

2. Scantiness ; not plenty.

PEN'URY, n. [L. *penuria,* from Gr. πεινη, needs.]

Want of property ; indigence ; extreme poverty.

All innocent they were exposed to hardship and penury. *Sprat.*

PE'ON, n. In Hindoostan, a foot soldier, or a footman armed with sword and target ; said to be corrupted from *piadah.* [Qu. L. *pes, pedis.*] Hence,

2. In *France,* a common man in chess ; usually written and called *pawn.*

PE'ONY, n. [L. *pæonia* ; Gr. παιονια, from παιων, Apollo.]

A plant and flower of the genus Pæonia. It is written also *piony.*

PEO'PLE, n. [Fr. *peuple* ; L. *populus* ; W. *pawb, pob,* each, every one ; *poblac,* common people ; G. *pobel* ; Ir. *pupul, pobul* ; Sp. *pueblo* ; Russ. *bobiel,* a peasant. This word coincides in elements with *babe* and *pupil,* and perhaps originally signified the children of a family, like *gens.*]

1. The body of persons who compose a community, town, city or nation. We say, the *people* of a town ; the *people* of London or Paris ; the English *people.* In this sense, the word is not used in the plural, but it comprehends all classes of inhabitants, considered as a collective body, or any portion of the inhabitants of a city or country.

2. The vulgar ; the mass of illiterate persons.

The knowing artist may judge better than the *people.* *Waller.*

3. The commonalty, as distinct from men of rank.

Myself shall mount the rostrum in his favor, And strive to gain his pardon from the *people.* *Addison.*

4. Persons of a particular class ; a part of a nation or community ; as country *people.*

Persons in general ; any persons indefinitely ; like *on* in French, and *man* in Saxon.

*People* were tempted to lend by great premiums and large interest. *Swift.*

6. A collection or community of animals.

The ants are a *people* not strong, yet they prepare their meat in the summer. Prov. xxx.

7. When *people* signifies a separate nation or tribe, it has the plural number.

Thou must prophesy again before many *peoples.* Rev. x.

8. In *Scripture,* fathers or kindred. Gen. xxv.

9. The Gentiles.

—To him shall the gathering of the *people* be. Gen. xlix.

PEO'PLE, v. t. [Fr. *peupler* ;] To stock with inhabitants. Emigrants from Europe have *peopled* the United States.

PEO'PLED, pp. Stocked or furnished with inhabitants.

PEO'PLING, ppr. Stocking with inhabitants.

PEO'PLISH, a. Vulgar. *Chaucer.*

PEPAS'TIC, a. [Gr. πεπαινω, to concoct or mature.]

A medicine that serves to help digestion ; applied particularly to such medicines as tend to promote the digestion of wounds. *Coxe.*

PEP'PER, n. [L. *piper* ; Sax. *pepper* ; D. *peper* ; Sw. *peppar* ; G. *pfeffer* ; Dan. *peber* ; Fr. *poivre* ; It. *pepe* ; Gr. πεπερι ; Hindoo, *pipel* ; Sanscrit, *pipali* ; Pers. *pilpil.*]

A plant and its seed or grain, of the genus Piper. The stem of the plant is vine requiring a prop, which is usually a tree. The leaves are oval and the flower white. We have three kinds of pepper, the black, the white, and the long. The black pepper is the produce of Java, Sumatra, Ceylon, and other Asiatic countries ; the white pepper is the black pepper decorticated ; the long pepper is the fruit of a different species, also from the E. Indies. It consists of numerous grains attached to a common footstalk. Pepper has a strong aromatic smell and a pungent taste. *Aviat. Res. Encyc.*

PEP'PER, v. t. To sprinkle with pepper.

2. To beat ; to pelt with shot ; to mangle with blows. *Shak.*

PEP'PER-BOX, n. A small box with a perforated lid, used for sprinkling pulverized pepper on food.

PEP'PER-CAKE, n. A kind of spiced cake or gingerbread.

PEP'PER-CORN, n. The berry or seed of the pepper-plant.

2. Something of inconsiderable value ; as lands held at the rent of a *pepper-corn.*

PEP'PERED, pp. Sprinkled with pepper ; pelted ; spotted.

PEP'PER-GINGERBREAD, n. A kind of cake made in England.

PEP'PERGRASS, n. A plant of the genus Pilularia ; also, a plant of the genus Lepidium.

PEP'PERING, ppr. Sprinkling with pepper ; pelting.

2. a. Hot ; pungent ; angry. *Swift.*

PEP'PERMINT, n. A plant of the genus Mentha. It is aromatic and pungent. Also, a liquor distilled from the plant.

# Exhibit B

PENTAPHYL'LUM (t. from the Greek πεντε five, and φυλλον a leaf) The cinquefoil.
PEN'TAPLA'TRON (t. in botany) The leffer plantain.
PEN'TAPOLIS (t. from the Greek πεντε five, and πολις a city) A diftrict containing five cities.
PEN'TAPTEROPHYL'LUM (t. in botany) The myrio-phyllum.
Pent'aptote (t. from pentaptoton) A noun which has five cafes.
PEN'TAPTOTON (t. in grammar, from the Greek πεντε five, and πτωσις a cafe) A noun that has five cafes.
PENT'ARCH (t. from the Greek πεντε five, and αρχη chief) A captain of five.     Cole.
PEN'TASPAST (t. from the Greek πεντε five, and πασπω to draw) An engine with five pullies.
PEN'TATYCH (t. from the Greek πεντε five, and τυχη a verfe) A poem or ftanza confifting of five verfes.
PEN'TASTYLE (t. in architecture, from the Greek πεντε five, and στυλος a pillar) A building or work in which are five rows of pillars.
PEN'TATEUCH (t. from the Greek πεντε five, and τευχος a volume) The five books of Mofes.
PENTATH'LON (t. from the Greek πεντα θλον, and αθλος a conteft) The five principal exercifes performed in the Grecian games.
PENTATH'LUM (t. a different fpelling) The pentathlon.
PEN'TATOTON (t. in ancient mufick) The fixth.
PEN'TECONTARCH (t. from the Greek πεντηκοντα fifty, and αρχη chief) A captain of fifty.
PEN'TECOST (t. from the Greek πεντηκοστη) A feaft among the Jews fo called becaufe it was celebrated fifty days after the paffover.
Pentecoftal (adj. from pentecoft) Belonging to Whit-funtide.     Sanderfon.
Pen'tecoftal (t. from the adj.) The offering made at Whitfuntide.
PEN'TEPHAR'MACUM (t. from the Greek πεντε five, and φαρμακον a remedy) Any medicine confifting of five in-gredients.
PEN'TEURIS (t. from the Lat.) A veffel made with five benches of oars on a fide.
Penthem'imer (t. from penthemimeris) The penthe-mimeris.     Ainfworth.
PENTHEMIME'RIS (t. from the Greek πεντε five, μερος half, and μετρον a part) A part of a verfe confifting of two feet and one long fyllable; a kind of cæfura.
PENTHEUS (t. in the mythology of the poets) The fon of Echion who if it faid was torn to pieces by his mo-ther, fifters and aunt for flighting the rites of Bac-chus.     Ovid.
Pentho'rum (t. in botany) A genus of plants.
Pent'houfe (t. from pent, and houfe) A fhed, a building floping out from a main wall.
PEN'TICE (t. from the Italian pendice) A floping roof, a penthoufe.
Pen'tile (t. from pent, and tile) A tile to cover the flop-ing part of a roof made hollow or circular.     Mopn.
PENTO'ROBON (t. in botany) The peony.
Pent'up (adj. from pent, and up) Shut up. "Chip pentup guilt."     Shakespeare.
PENU'EL (t. from the Heb. fignifying the vifion of God) The name of a place, Penuel.
PEN'ULATOR (t. from the Lat. penult a napped coat) A furrier.     Cole.
PENUL'TIMA (t. in grammar, from the Lat. pene al-moft, and ultima the laft) The laft fyllable but one; a note in the antient fcale of mufic.
Penul'timate (adj. from penultima) Belonging to the laft fyllable but one, belonging to the laft but one.
PENUMB'RA (t. from the Lat. pene almoft, and umbra a fhadow) An imperfect fhadow, a faint or partial fhadow.
Penu'rious (adj. from penury) Niggardly, illiberal, for-did; fparing, wanting plenty.
Penu'rioufly (adv. from penurious) Sparingly, in a fcanty manner; in the manner of a niggard.
Penu'rioufnefs (t. from penurious) Niggardlinefs, par-fimony.
PEN'URY (t. from the Lat. penuria) Poverty, indigence.
PE'ONY (t. in botany) The piony, the name of a plant, the name of a flower.
PEO'PLE (t. from the Lat. populus) A nation, the indi-viduals compofing a community; the community, the bulk of a nation; perfons of a particular clafs; per-fons in general.
Peo'ple (v. t. from the fub.) To flock with inha-bitants.
Peo'pled (p. from people) Stocked with people.
Peo'pling (p. a. from people) Stocking with people, inhabi-tants.

PFIOR (t. from the Heb. fignifying a hole) A mountain in the land of Canaan.
Pip (t. and is common a fpelling) A pip.     Scott.
PEP'ANISIS (t. from the Greek πεπανσις to ripen) The pedalinus, the concoction of depraved humours.
PEPAS'MUS (t. from the Greek πεπασμος to mature) The maturation of morbid humours.
PEPAS'TIC (adj. from the Greek πεπασσω to ripen) Suited to digeft crudities in the ftomach.
Pepas'tic (t. from the adj.) A medicine to help digeftion or correct the crudities of the ftomach.
PEP'EN (s.) A man's name.
Pep'ine (t. not ufed) Kernels.     Cole.
Pep'lon (t. an old word) A love potion.     Cole.
PEP'LIS (t. in botany) The water purflain, a genus of plants.
Pep'line (adj. ufable) Mean, vulgar.     Chaucer.
PEP'PO (t. in botany) The pompion.
PEPO'RION (t. in church hiftory) A kind of Monta-nift.     Bail'y.
PEP'PER (t. from the Lat. piper) An aromatic pungent kind of grain brought from India.
Pep'per (v. t. from the fub.) To fprinkle with pepper; to beat, to mangle with fhot, to mangle with blows.
Pep'perbox (t. in ornithology) A fpecies of the ramphaftos.
Pep'perbox (t. from pepper, and box) A box to hold pepper.
Pep'percorn (t. from pepper, and corn) A grain of pep-per; any thing of trifling value.
Pep'pered (p. from pepper) Sprinkled with pepper; beaten, mangled with fhot or blows.
Pep'pering (p. a. from pepper) Sprinkling with pepper; beating, mangling with blows.
Pep'permint (t. in botany) A kind of mint.
Pep'perwater (t. from pepper, and water) Water in which pepper has been infufed.
Pep'perwort (t. in botany) The name of an herb.
PEP'SIS (t. from the Greek) The concoction of food, the maturation of humours.
Pep'tic (adj. from pepfis) Digeftive, promoting con-coction.
PER (prep. from the Lat.) By, through.
PERAC'TIC (t.) A mathematical inftrument ufed in furveying.
Perac'tion (t. not ufed) The act of finifhing.     Cole.
PERACU'TE (adj. from the Lat. peracutus) Very fharp, very violent.     Harvey.
PERADVEN'TURE (adv. from the Lat. per by, and ad-ventura a coming) Perhaps, by chance.
Peradven'ture (t. from the adv. but not much ufed) Doubt, queftion.     South.
PERA'GRATE (v. int. from the Lat. per through, and ager a field) To wander through the country, to rove about.     Johnfon.
Perag'rating (p. a. from peragrate, but not ufed) Wan-dering about.
Perag'ration (t. from peragrate) The act of paffing through any fpace or place.
PERAM'BULATE (v. int. from the Lat. per through, and ambulo to walk) To walk through, to furvey by paf-fing through.
Peram'bulated (p. from perambulate) Paffed through, furveyed by paffing through.
Peram'bulating (p. a. from perambulate) Paffing through, furveying by paffing through.
Perambula'tion (t. from perambulate) The act of paffing through, a travelling furvey.
Peram'bulator (t. from perambulate) A wheel for mea-furing roads.
PERAN'GUST (adj. from the Lat. per and anguftus ftrait) Very narrow.     Cole.
PERA'RATE (v. t. from the Lat. per through, and aro to plough) To plough through.
Pera'vail (t. a law term) A fubordinate tenant, a par-avail.     Phillips.
Peraven'ter (adv. obfolete) Perhaps.     Chaucer.
Peraven'ture (adv. an obfolete fpelling) Peradventure.     Cb.
PER'CA (t. in ichthyology) The perch.
Per'cafe (adv. from per, and cafe, but not ufed) Per-haps, peradventure.     Bacon.
Perceptoire (t. in old records) A ware or dam in a river for catching fifh.
PERCAR'DIA'TA (t. in natural hiftory) A kind of ftone found in the head of a perch.
Perce (va. t. obfolete) To pierce.
PERCE (t. an obfolete fpelling) A perfon.     Chaucer.
Perce' (adj. in heraldry) Perforated, reprefented as hav-ing a hole bored through.     Dict. of Arts.
PER'CEANT (adj. from the French perceant) Penetrating, piercing.     Spenfer.
Perce'ivable

# Exhibit C

## PEN

Penny wife and Pound foolish.

This Proverb feverely lashes such Persons who are thrifty to an Error in small, but no wayes Expences; but profusely extravagant in wayes very vast; intimating, That the Wisdom of such Parsimony to no less saying, than the saving of a Cask of Wine at the Tap, while they are turning it out at the Bung hole. *Ad mensuram æquam bibetur, sint mensura eytum commodum.* Latin. Μετρω ίδιω κενεω̧ ἀντχρεω μαΐου ἰσεω̧. Gr.

PENNYWORTH, what has the Value of a Penny.

PENSA, a Weight of Salt, Cheese, &c. containing 256 lb. O. L.

*Ad PENSAM,* the full Weight of an Ounce Troy, which was formerly paid into the Exchequer for a Pound Sterling.

PENSIL [*pensilis,* L.] hanging.

PENSILITY [*pensilitas,* L.] Hangingness.

PENSION, a Salary, or yearly Allowance. F. of L.

The PENSION [of Gray's Inn] an Assembly of the Members of that Society who meet to consult about the Affairs of the House.

To PENSION, to allow a Maintenance.

PENSION Writ, an Order of that House against such as are in Arrears for Pensions and other Duties.

PENSIONARY [in Holland] the chief Minister in the Government of each City.

PENSIONER [*pensionaire, F. pensionarius,* L.] one who receives a Pension; also one who is maintained in a College or Hospital at the King's Charge.

PENSIONER [in the University of Cambridge] a Scholar who pays for his Commons. The King's PENSIONERS, a Band of Gentlemen PENSIONERS, Gentlemen who, armed with Partizans, attend as a Guard upon the King's Person in the Palace.

To PENSITATE [*pensitatum,* L.] to weigh, consider, or ponder in the Mind.

PENSIVE, [*sad, heavy, forrowful,* thoughtful. F.

PENSIVELY, thoughtfully, forrowfully.

PENSIVENESS, Thoughtfulness, Sorrowfulness.

PENT [of *pennan, Sax.*] shut up. *Spenc.*

PENTACAPSULAR [with and *capsular*] having five Cavities.

PENTACHORD [*πεντε* and *χορδὴ*] an Instrument with five Strings.

PENTAHODROUS [with and *Hora*] having five Sides.

PENTAGON [*pentagon,* F. *pentagonos,* L. of *πεντε*γω̧σ, of *πεντε,* five, and *γωνία,* a Corner, Gr.] a geometrical Figure, having five Sides and five Angles.

PENTAGONAL,      belonging to a Pen-
PENTAGONOUS,   tagon, or having five
Sides and five Angles.

PENTAMETER [*πενταμετρον,* of *πεντε,* and *μετρον,* a Measure, Gr.] a Greek or Latin Verse, which consists of five Feet. L.

## PEP

PENTAPETALOUS [*plants* [among Herenlists] are such as have a Flower consisting of five Leaves.

PENTAPTOTON [*πενταπτωτον,* Gr.] a Noun that has but five Cases. *Gram.*

PENTASTICH [*πενταστιχον,* L. of *πεντε,* five, *χίχε,* Gr.] a Stanza or Division in a Poem, consisting of five Verses.

PENTATEUCH [*pentateuchus,* L. of *πεντα,* τευχω̧, of *πεντε,* and *τευχω̧,* a Volume, Gr.] the five Books of *Moses.*

PENTECON'TARCH [*pentecontarchos,* L.] of *πεντηκονταρχος,* of *πεντηκοντα,* fifty, and *ἀρχω,* a Ruler, Gr.] a Captain who has the Command of fifty Men.

PENTECOST [*pentecoste,* F. *pentecoste,* L. of *πεντηκοστη,* Gr. i. e. the fiftieth Day after *Easter*] the Festival of *Whitsuntide.*

PENTECOSTALS, Offerings made at *Whitsuntide,* by the Parishioners to the Priests.

PENTEPHARMACON [of *πεντε,* five, and *φαρμακον,* a Remedy, Gr.] any Medicine consisting of five Ingredients.

PENTHEMIMERIS [*πενθημιμερις,* Gr.] Part of a *Greek* or *Latin* Verse, consisting of two Feet and a long Syllable, &c. *Gram.*

PENTHOUSE [*appentis,* F. *pendiso,* Ital. *appendix,* of *pendere,* L. to hang] a Shelter over a Door or Window.

PENTICE, a Penthouse; also a Shed.

PENULTIMA [in Grammar, i. e. *pene ultima*] the last Syllable of a Word save one. L.

PENUMBRA [in *Astronomy*] is a faint kind of Shadow, or the utmost Edge of the perfect Shadow, which happens at the Eclipse of the Moon; a partial Shadow. L.

PENURIOUS [of *penuria,* L.] covetous, niggardly, sparing; also nice.

PENURIOUSLY, sparingly, covetously.

PENURIOUSNESS, Niggardliness.

PENURY [*penuria,* L.] extreme Want of Necessaries.

PEONY [*pæonia,* L. of *πανια,* Gr.] a Flower of two Sexes, both Male and Female.

PEOPLE [*peuple,* F. *populus,* L.] the whole Body of Persons who live in a Country, or make up a Nation.

To PEOPLE [*peupler,* F. *populare,* L.] to stock with People.

PEPASMUS [*πεπασμος,* Gr.] the Ripening of preternatural Humours.

PEPASTICKS [*πεπαστικα,* Gr.] Medicines that allay and digest Crudities.

PEPOZIANS, a Sect of Christian Hereticks who sprung up in the second Century, a Branch of the *Montanists.*

PEPPER [*peper,* L. S. and Belg. *pfeffer,* Teut. *pevere,* F. of *piper,* L.] an *Indian* Spice.

PEPPERCORN, the least Trifle, a Thing of the meanest Value.

PEPPER-Wort, an Herb. *Lepidium,* L.

PEPPERY, hot as Pepper.

PEPSIS [*πεψις,* Gr.] a boiling or seething.

PEPSIS

# Exhibit D

by the publick herald, and had also a crown of great value bestowed upon him.

PENTECOST (A.) literally signifies the ordinal number called the fiftieth; and among the Jews, it is what they called the feast of weeks, it being the fiftieth day after the sixteenth of Nisan, or the second day of the passover, which continued full seven weeks, at which time they offered the first fruits of the wheat harvest, which at that time was compleated; this offering consisted of two loaves of leavened bread, six pints of meal, seven lambs of that year, one calf, and two rams for a burnt-offering, two lambs for a peace-offering, and a goat for a sin-offering; it was instituted among the Jews, first, to oblige the Israelites to appear at the temple of the Lord, there to acknowledge his absolute dominion over the whole country, and on their labours; and secondly, to call to remembrance, and to give God thanks for the law which he had given them from Mount Sinai, the fiftieth day after their coming out of Egypt; the modern Jews celebrate this feast for two days, during which they abstain from labour and all secular business; they dress their synagogues and places where they read the law, and also their houses, with garlands made of roses, flowers, &c. and shew all manner of tokens of joy, pleasure and satisfaction; the Christian church also celebrates this feast fifty days, or seven weeks after Easter, for the feast of the resurrection of our Saviour; and this is, and has always been, observed upon a Sunday, upon account of the apostles having, after the ascension of Christ, assembled themselves together (it is reported by some) in the house of Mary the mother of John, upon Mount Sion, when they waited for the Holy Ghost which Christ had promised to send them; and about nine of the clock in the forenoon there was a noise as of a mighty wind that filled the whole house, and at the same time the appearance of fire in the shape of tongues, parted or cloven, settled upon each of their heads, and from that time they were endowed with the spirit of speaking various tongues, &c. this is put by the chronologers in the year 33.

PENTECOSTALS (S.) offerings or presents made by the people to their parochial minister, or of small churches to their great or mother church at Whitsuntide.

PENTECOSTARIAN (S.) in the Greek Church, is one of their ecclesiastical books, that contains the office for the church from Easter-day till the eighth day after Pentecost, which they call the Sunday of all the Saints, and in the Roman Church Trinity-Sunday.

PENTHOUSE (S.) in Building, is a shelter made of boards, &c. over a door, window, &c. to keep goods and persons both from the rain and sun.

PENULTIMA (S.) in words of several sylla-

bles, means the last but as one, as in compounding, pound is the penultima.

PENUMBRA (S.) in Astronomy, is a faint or partial shadow observed between the perfect shadow, and the full light in an eclipse; and this degree of light and shadow of the penumbra will be greater or less, as the parts lie open to a greater or lesser part of the sun's body in calculations of eclipses, whether of the sun, moon, or other planets, primary or secondary; but it is most considerable in that of the sun.

PENURIOUS (A.) covetous, niggardly, flingy; also curious or nice.

PENURY (S.) great poverty, or want, extream necessity, &c.

PEOPLE (S.) signifies every person, or the whole collection of inhabitants in a nation or kingdom; and these are sub-divided into various classes, such as the common people, the great or rich people, &c.

PEOPLE (V.) to stock or furnish an uninhabited place with people or inhabitants.

PEPPER (S.) a sort of spice that grows in small round grains in the India, of a hot and dry nature or quality, and used to season soups, &c. also to throw upon those fruits that are cold and moist; it grows upon a weak and low shrub of the reptile kind, and commonly planted at the root of large trees; the roots, berries, or seeds grow in clusters like grapes, which are at first green, when ripe and on the tree red; and being gathered and dried in the sun, become almost black; and this is what is commonly called black pepper; the white pepper is the fruit of the same plant, and is prepared by moistening the grain in sea water, and then drying it in the sun; this occasions the outward husk or husk to peel off, and so leaves only the seed or pulp which is white; long pepper is much the same, only it grows in heads like Indian corn, with many grains close husked together in heads, about the length and thickness of a child's finger, and is not quite so pungent as the other; there is another sort called Guinea-pepper, or after Indian, which is of a red colour, some of which is very sharp, strong, or pungent; there is also another sort called Jamaica-pepper, and by some allspice, upon account of its pleasant and universal aromatick taste, when pounded or ground to powder.

PEPPERED (A.) strewed or high seasoned with pepper, also very much or severely punished by pelting, &c. also a term for one that has got the pox or foul disease to a great height.

PERADVENTURE (Part.) perhaps, it may be so, &c.

PERAMBULATION (S.) a walking or going thro' any place, in order to settle the boundaries, &c.

PERAMBULATOR (S.) one who goes over a field, wood, or manor, to settle the boundaries,

# Exhibit E

the manner authorized by this section, it shall be liable to, and shall pay the assessment or assessments provided for in section thirty of this chapter.

§ 3. This act shall take effect immediately.

## Chap. 580.

AN ACT to amend the penal law, in relation to the possession and use of dangerous weapons.

Became a law May 21, 1917, with the approval of the Governor. Passed, three-fifths being present.

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. Section eighteen hundred and ninety-seven of the penal law, as amended by chapter one hundred and ninety-five of the laws of nineteen hundred and eleven, chapter six hundred and eight of the laws of nineteen hundred and thirteen and chapter three hundred and ninety of the laws of nineteen hundred and fifteen, is hereby amended to read as follows:

§ 1897. **Carrying and use of dangerous weapons.** A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

A person who carries or possesses a bomb or bombshell, or who, with intent to use the same unlawfully against the person or property of another, carries or possesses any explosive substance, is guilty of a felony.

Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of juvenile delinquency.

Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon

the person, without a written license therefor, issued to him as hereinafter prescribed, shall be guilty of a misdemeanor, and if he has been previously convicted of any crime he shall be guilty of a felony.

Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, issued as hereinafter prescribed and licensing such possession and concealment, shall be guilty of a misdemeanor, and if he has been previously convicted of any crime he shall be guilty of a felony.

Any person not a citizen of the United States, unless authorized by license issued as hereinafter prescribed, who shall have or carry firearms, or any dangerous or deadly weapons in any place, at any time, shall be guilty of a misdemeanor, and if he has been previously convicted of any crime he shall be guilty of a felony.

It shall be the duty of the police commissioner in the city of . New York and[1] of any magistrate elsewhere[2] in this state to whom an application therefor is made by a commissioner of correction of a city or by any warden, superintendent or head keeper of any state prison, penitentiary, workhouse, county jail or other institution for the detention of persons convicted of or accused of crime, or offenses, or held as witnesses in criminal cases, to issue to each of such persons as may be designated in such applications and who is in the regular employ in such institution of the state, or of any county, city, town or village therein, a license authorizing such person to have and carry concealed a pistol or revolver while such person remains in the said employ.

It shall be the duty of the police commissioner in the city of New York and[1] of any magistrate elsewhere[2] in this state, upon application therefor, by any householder, merchant, storekeeper or messenger of any banking institution or express company in the state, and provided such police commissioner or[3] magistrate is satisfied of the good moral character of the applicant, and provided that no other good cause exists for the denial of such application, to issue to such applicant a license to have and possess a pistol or revolver, and authorizing him (a) if a householder, to have such weapon in his dwelling, and (b) if a merchant, or storekeeper, to have such weapon in his place of business, and (c) if a messenger

[1] Words " of the police commissioner in the city of New York and," new.
[2] Word " elsewhere " new.
[3] Words " police commissioner or " new.

of a banking institution or express company, to have and carry such weapon concealed while in the employ of such institution or express company.

In addition, it shall be lawful for the police commissioner in the city of New York or[4] any magistrate elsewhere in this state,[5] upon proof before him that the person applying therefor is of good moral character, and that proper cause exists for the issuance thereof, to issue to such person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon, provided, however, that no such license shall be issued to any alien, or to any person not a citizen of and usually resident in the state of New York, except by the police commissioner in the city of New York and elsewhere by[6] a judge or justice of a court of record in this state, who shall state in such license the particular reason for the issuance thereof, and the names of the persons certifying to the good moral character of the applicant.

Any license issued in pursuance of the provisions of this section may be limited as to the date of expiration thereof and may be vacated and canceled at any time by the police commissioner,[7] magistrate, judge or justice, who issued the same, or, elsewhere than in the city of New York,[8] by any judge or justice of a court of record. [9]The conviction of a licensee of a felony in any part of the state shall operate as a revocation of the license. Any license issued in pursuance of this section and not otherwise limited as to place or time of possession of such weapon, shall be effective throughout the state of New York, notwithstanding the provisions of any local law or ordinance.

This section shall not apply to the regular and ordinary transportation of firearms as merchandise, nor to sheriffs, policemen, or to other duly appointed peace officers, nor to duly authorized military or civil organizations, when parading, nor to the members thereof when going to and from the place of meeting of their respective organizations.

§ 2. This act shall take effect immediately.

---

[4] Words " the police commissioner in the city of New York or," new.
[5] Words " elsewhere in this state," new.
[6] Words " the police commissioner in the city of New York and elsewhere by," new.
[7] Words " police commissioner " new.
[8] Words " elsewhere than in the city of New York," new.
[9] Following sentence new.