FTB:AP
F. #2022R00795

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

      - against -                         Docket No. <u>22–CR-473 (DLI)</u>

KARA STERNQUIST

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION</u><br><u>TO THE DEFENDANT'S MOTION TO DISMISS</u>

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

F. Turner Buford
Andres Palacio
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

I.   BACKGROUND ...................................................................................... 1

II.  ARGUMENT ............................................................................................ 4

    A.   Both the Second Circuit and the Supreme Court have repeatedly confirmed that Section 922(g)(1) is constitutional, a conclusion not disturbed by Bruen. ................... 5

    B.   Prohibitions on felon possession are consistent with the nation's history and tradition........................................................................................ 13

       1.   The text of the Second Amendment and its historical context do not grant convicted felons the right to keep and bear arms. ................................................... 14

       2.   Felon disarmament is well-supported by a long tradition of disarming certain individuals viewed as threats to the public order. ................................................. 14

CONCLUSION..................................................................................... 21

PRELIMINARY STATEMENT

The United States respectfully submits this memorandum of law in opposition to the motion to dismiss the indictment (the "Motion") filed by the defendant Kara Sternquist on May 30, 2023. (ECF No. 74). The defendant is charged with several felony counts, including possessing a firearm after having been previously convicted of a felony in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2). The defendant seeks dismissal of the indictment against her, arguing that the statutory dispossession of individuals convicted of non-violent felonies violates her Second Amendment right to keep and bear arms in the wake of the Supreme Court's decision in New York State Rifle & Pistol Association v. Bruen, 142 S. Ct. 1525 (2022). For the reasons set forth below, the Motion should be denied.

I.      BACKGROUND

On April 11, 2007, the defendant pleaded guilty in the Southern District of Ohio to producing false identification documents in violation of 18 U.S.C. §§ 1028(a)(1), (b)(1)(A) (identity theft). See 07-CR-033 (WHR), S.D. Ohio. [1] As part of a plea agreement to an information, the defendant stipulated to a statement of facts that admitted the following in relevant part:

> At [a] residence, MICHAEL STERNQUIST manufactured and produced at least 15 identification cards and authentication features, including, among others, a counterfeit United States Department of Defense identification and counterfeit driver licenses from the states of Illinois, California, and Texas. In order to manufacture the identification cards, MICHALE STERNQUIST used authentication features and equipment

---

[1] At the time of her prior convictions, the defendant used the name Michael J. Sternquist. The defendant identifies as female, and her legal name is now Kara Sternquist.

> which he had purchased for that purpose using the internet, primarily the e-Bay website.  MICHAEL STERNQUIST used official names, seals and other authentication features to make the cards appear legitimate.  MICHAEL STERNQUIST received the authentication features and equipment designed and suited for making the identification cards through the United States Postal Service or private or commercial interstate carriers at addresses he had provided the seller over the internet.

On July 11, 2007, the defendant was sentenced to 12 months' imprisonment followed by three years of supervised release in connection with that conviction.

Three years later, on June 30, 2010, the defendant pleaded guilty to an information in the District of New Jersey to making and selling computerized templates for producing fake identification documents, in violation of 18 U.S.C. §§ 1028(a)(5), (b)(3)(c) (identity fraud).  See 10-CR-432 (FLW), D.N.J.  The complaint against the defendant alleged that upon execution of a search warrant at the defendant's residence, law enforcement agents recovered, among other things, specialty paper used in the manufacture of identity documents, acrylic and UV inks used in the production of identification documents, cutting implements, lamination pouches and color print-outs of New York drivers' licenses with the identifying information of other individuals.  The complaint also alleged that agents connected the defendant to a Gmail email address, which she used to communicate with others regarding the sale and potential sale of digital templates for various state drivers' licenses, as well as digital templates for federal law enforcement and New York City Police Department credentials.

On October 8, 2010, the defendant was sentenced to 27 months' imprisonment followed by three years of supervised release in connection with that conviction.  After her release from prison, the defendant relocated to New York.

2

On June 19, 2021, the defendant was arrested in Manhattan and later charged by New York state prosecutors with criminal mischief in the second degree, a violation of N.Y. Penal Law § 145.10.  While state charges were pending, officers of the U.S. Customs and Border Protection intercepted several international mail parcels at John F. Kennedy International Airport addressed to the defendant's home.  These packages, shipped from various locations in China, contained fraudulent badges purporting to belong to various government agencies, including the Environmental Protection Agency, the U.S. Marshal's Service, and the U.S. Department of State.

On September 14, 2022, federal agents executed a search warrant at the defendant's home.  They found dozens of additional counterfeit badges, fake passports, counterfeit seals, military identification cards, and stolen credit cards.  During the execution of the warrant, agents recovered 23 firearm-related pieces of equipment, which included 15 suppressors (silencers) and 8 items that qualified as "firearms" for purposes of section 922(g)'s prohibition.  One of those firearms qualified as a "machine gun," as defined by 18 U.S.C. § 921(a)(24).

On October 17, 2022, a federal grand jury sitting in the Eastern District of New York indicted the defendant on multiple felony counts, including wrongfully procuring government seals in violation of 18 U.S.C. § 1017; unauthorized possession of badges and identification cards in violation of 18 U.S.C. § 701; and being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The defendant now brings this motion to dismiss the § 922(g)(1) felon-in-possession count, arguing that it violates her Second Amendment right to keep and bear arms.

II.    <u>ARGUMENT</u>

The defendant argues that the application of § 922(g)(1)'s prohibition on possession of firearms by individuals convicted of non-violent felonies violates the Second Amendment.  This argument fails on several grounds.

First, the constitutionality of the provision is supported by well-established Second Circuit precedent that has directly upheld the constitutionality of § 922(g)(1), <u>see, e.g.,</u> <u>United States v. Bogle</u>, 717 F.3d 281 (per curium) (2d Cir. 2013), as well as several opinions from the Supreme Court that discuss them approvingly.  <u>See, e.g.,</u> <u>District of Columbia v Heller</u>, 554 U.S. 570, 626-27 (2008).  None of these cases were disturbed or undermined by <u>Bruen</u> and most post-<u>Bruen</u> lower courts have applied them as such.  <u>See, e.g.,</u> <u>United States v. Jackson</u>, 69 F.4th 495, 502 (8th Cir. 2023).

Next, a plethora of examples from within the nation's "historical tradition of firearm regulation," <u>Bruen</u>, 142 S. Ct. at 2126, provide support for Congress's decision to restrict felons from possessing firearms.  Early state legislatures routinely forbid certain groups from possessing arms, usually based on the perception that the groups threatened public order and stability, easily satisfying the historical requirement set out in <u>Bruen</u>.  The defendant's claims otherwise are conjectural, the result of an overly narrow inquiry that fails to view the absence of explicit statutory dispossession within the historical context that <u>Bruen</u> demands. <u>See</u> <u>id.</u> at 2133.

The defendant has twice been convicted of serious felonies and is currently facing additional felony charges.  She is not a "law-abiding, responsible citizen," <u>id.</u> at 2156, and federal law does not permit her to own a weapon.  The Second Amendment does not

offer her relief.  Because the prohibitions set out in § 922(g)(1) are supported by a long line of precedent as well as a number of historical analogues, the Court should deny the Motion.

    A.    <u>Both the Second Circuit and the Supreme Court have repeatedly confirmed that Section 922(g)(1) is constitutional, a conclusion not disturbed by Bruen.</u>

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  This Amendment protects the right of law-abiding citizens to keep arms "in defense of hearth and home."  <u>Heller</u>, 554 U.S. at 635; <u>see also</u> <u>McDonald v. City of Chicago</u>, 561 U.S. 742, 786 (plurality opinion) (2010).  However, "like most rights, the right secured by the Second Amendment is not unlimited" and is enjoyed only by "law-abiding, responsible citizens."  <u>United States v. Bryant,</u> 711 F.3d 364, 369 (2d Cir. 2013) (quoting <u>Heller</u>, 554 U.S. at 626, 635); <u>see also</u> <u>Robertson v. Baldwin</u>, 165 U.S. 275, 281 (1897) (endorsing certain restrictions on the right to bear arms).  So long as it works within the constitutional bounds of the Second Amendment, the government may regulate the possession of weapons.  <u>See</u> <u>McDonald</u>, 561 U.S. at 786 ("the right to keep and bear arms is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (quoting <u>Heller</u>, 554 U.S. at 626)).

Accordingly, over the years, Congress has seen fit to enact a number of provisions that lawfully limit the possession of weapons by certain individuals.  The provision at issue in this case prohibits the possession of guns or ammunition by any individual "who has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 922(g)(1).  This provision serves to keep dangerous weapons out of the hands of individuals who have demonstrated a proclivity to

"[dis]obey the government and its laws, whether or not they ha[ve] demonstrated a propensity for violence."  Jackson, 69 F.4th at 502 (quoting Range v. Att'y Gen (Range I), 53 F.4th 262, 269 (3d Cir. 2022) (per curium), rev'd, Range v. Att'y Gen (Range II) 69 F.4th 96 (3d Cir. 2023) (en banc)).

The constitutionality of this provision is long settled.  The Second Circuit has held as such in Bogle, 717 F.3d. at 281-82, as have all but one circuit to consider the issue. See id. at 281 n.1 (collecting cases); Dru Stevenson, In Defense of Felon-in-Possession Laws, 43 Cardozo L. Rev. 1573, 1577-79 & 1579 n.19 (same).  The Supreme Court itself has continuously reiterated the constitutionality of felon dispossession, even naming it as one of several "presumptively lawful" regulations that would pass constitutional muster, see Heller, 554 U.S. at 626-27 & 627 n.26 (2008); see also McDonald, 561 U.S. at 786 (2010) (reiterating Heller's safe harbor for felon dispossession), and lower courts applying both cases have treated them as if they were binding.  See, e.g., United States v. Jimenez, 895 F.3d 228, 233 (2d Cir. 2018) ("We have . . . relied on this passage to uphold the federal ban on ex-felon's access to firearms and ammunition.").  While the defendant is correct that the Supreme Court has never addressed this question directly, see Def.'s Mot. at 21-23, it has routinely denied certiorari when given a chance to overturn the near unanimity among the lower courts.  See, e.g, Medina v. Barr, 140 S. Ct. 645 (2019), denying cert. to Medina v. Whitaker, 913 F.3d 152 (D.C. Cir. 2019).

The defendant contends that Heller's and McDonald's assurances have been abrogated by the Court's recent decision in Bruen.  Presenting the prior pronouncements on this issue as dicta, her Motion argues that the safe harbor for felon dispossession is no longer good law.  Def.'s Mot. at 22-23.  This argument fails on several grounds.

For one, the defendant's argument that the Supreme Court intended to abrogate the safe harbors in <u>Heller</u> and <u>McDonald</u> has no support in the <u>Bruen</u> opinion.  In fact, the opinion seems to suggest exactly the opposite, going out of its way to announce that it is entirely "consistent with <u>Heller</u> and <u>McDonald</u>," 142 S. Ct. at 2122, and even characterizes its analysis as a direct application of <u>Heller</u> and <u>McDonald</u>'s methodology. <u>See id</u>. at 2128-29.  Further, like prior cases, the <u>Bruen</u> opinion itself repeatedly characterizes the right to keep and bear arms as one that belongs to "law-abiding citizens."  This characterization—which the Court invokes "no fewer than fourteen times," <u>United States v. Price</u>, 2023 WL 1970251, at *2 (N.D. Ill. Feb. 13, 2023)—demonstrates that the Court never intended to abandon its view of felon dispossession announced in prior cases.  <u>Bruen</u> concluded that overly restrictive state gun-control laws violate the constitutional rights of "law-abiding citizens with ordinary self-defense needs."  142 S. Ct. at 2150, 2156.  Yet, the defendant urges this court to summarily ignore this limiting language and stretch the definition of this phrase to encompass a twice-convicted felon's right to keep a small arsenal of dangerous weapons.  <u>See</u> Def.'s Mot. at 21.  This argument is meritless, and such a decision would itself be inconsistent with <u>Bruen</u>.

The defendant further suggests that the <u>Bruen</u> Court's treatment of concealed carry licensing—which she views as inconsistent with <u>Heller</u>—demonstrates that the Court has abandoned its reasoning in <u>Heller</u>.  <u>See</u> Def.'s Mot. at 22-23.  But these restrictions were not included among <u>Heller</u>'s list of "presumptively lawful regulatory measures" and were

only discussed briefly within the Court's broader historical analysis.[2]  See Heller, 554 U.S. at

626-27 & 627 n.26.  There is accordingly no indication that the Court viewed these as within

the same vein as felon-possession prohibitions.  Indeed, the Court has made it quite clear that

it alone retains the prerogative of overturning its previous opinions, even if the reasoning

appears contradictory.  E.g., Rodriguez de Quijas v. Shearson/Am. Exp., Inc., 490 U.S. 477,

484 (1997) ("If a precedent of this Court has direct application in a case, yet appears to rest

on reasons rejected in some other line of decisions, the Court of Appeals should follow the

case which directly controls, leaving to this Court the prerogative of overruling its own

decisions").

        While the constitutionality of § 922(g) is not specifically enunciated in the

Bruen majority opinion, each member of the majority, with the exception of Justice Barrett,

has joined a recent opinion endorsing the lawfulness of the provision.  In Bruen itself, a

concurring opinion authored by Justice Kavanaugh and joined by Chief Justice Roberts—two

votes necessary to form the majority—specifically say that the majority's opinion does not

undermine the safe harbor for felon dispossession, incorporating Heller's assurance that

"[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons . . . . " Bruen, 142 S. Ct. at 2162 (Kavanaugh, J., joined by

Roberts, C.J., concurring) (quoting Heller, 554 U.S. at 636-37 & n.26).  Justice Alito

───────────────────

    [2] The Court stated: "Although we do not undertake an exhaustive historical analysis
today of the full scope of the Second Amendment, nothing in our opinion should be taken to
cast doubt on longstanding prohibitions on the possession of firearms by felons and the
mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools
and government buildings, or laws imposing conditions and qualifications on the commercial
sale of arms." Heller, 554 U.S. at 626-27. The Court never identifies restrictions on
concealed carry as falling within the Heller safe harbor.

8

articulated a similar perspective as recently as 2020, writing that the Heller Court "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons" in an opinion joined by Justices Thomas and Gorsuch. N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas & Gorsuch, JJ., dissenting); see also Bruen 142 S. Ct. at 2159 (Alito, J., concurring) (emphasizing the narrowness of the Bruen holding). The three dissenting Justices in Bruen also noted that they read the majority opinion as not disturbing the Heller safe harbor. See id. at 2189 (Breyer, J., dissenting) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of Heller's holding").

Further, nothing in the Bruen opinion abrogates the Second Circuit's prior holdings in Bogle and its progeny, which incorporated the Heller safe harbor into binding circuit precedent. See, e.g., Bogle, 717 F. 2d at 281; Jimenez, 895 F.3d at 231-34; Johnson v. Chambers, 2021 WL 4484929 (2d Cir. Oct. 1, 2021). The panels in these cases correctly viewed the Supreme Court's pronouncements on felon dispossession as a significant and unignorable part of the opinion. This reasoning was not abrogated by Bruen. Bogle, for instance, did not engage in the once-popular means-end analysis rejected by Bruen.[3] The panel instead relied entirely on the safe harbor in Heller and McDonald, effectively transforming it into binding circuit precedent. See United States v. Hampton, 2023 WL

---

[3] Other circuits have also upheld § 922(g)(1) without engaging in means-end analysis, albeit prior to Bruen. See United States v. Scroggins, 599 F.3d 433, 451 (5th Cir. 2010); United States v. Rozier, 598 U.S. 768, 771 (11th Cir. 2010) (per curium); United States v. McCane, 573 F.3d 1037, 1047 (10th Cir. 2009).

3934546, at *12 (S.D.N.Y. June 9, 2023) ("With Heller and McDonald still in full force after Bruen, Bogle remains binding precedent within this [Second] Circuit on the constitutionality of section 922(g)."). Judicial dicta, while not technically binding, "must be given considerable weight" by lower courts, which are not free to "cavalierly disregard" it. See United States v. Bell, 524 F.2d 202, 206 (2d Cir. 1975). The Second Circuit was correct to rely on it in Bogle, and this circuit precedent remains binding law despite the defendant's claims otherwise. See United States v. Peguero, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of [the Second Circuit] is bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court." (citation omitted)).

Ultimately, there is every indication that Bruen is entirely consistent with prior cases, and most other post-Bruen courts have held as such. While the Second Circuit has not yet decided a Bruen challenge to § 922(g)(1),[4] similar Bruen challenges have also failed in this district, see, e.g., United States v. Augustin, No. 22-CR-18 (DG) (E.D.N.Y. Dec. 7, 2022) (oral opinion), as well as in the Southern District, see, e.g., United States v. King, No. 21-CR-2555 (NSR), 2022 WL 5240928 at *4-5 (S.D.N.Y. Oct. 6, 2022) (rejecting the challenge as "meritless").

The lone court to find that an application of § 922(g)(1) violated the Second Amendment was the Third Circuit in Range II, which overturned prior circuit precedent that upheld felon-possession prohibitions as applied to the petitioner in that case. The Third

---

[4] This issue is pending in the Circuit in United States v. Thawney, 22-1399 (2d Cir.) and Zherka v. Garland, 22-1108 (2d Cir.).

Circuit's opinion in Range created a post-Bruen circuit split with the Eighth Circuit, which had upheld § 922(g)(1) in the face of a Bruen challenge days earlier in Jackson, 69 F.4th at 495.

The Third Circuit's decision, however, ought to have no bearing on this Court. To be sure, the Range opinion strikes down § 922(g)(1) as unconstitutionally applied—but it does so narrowly, and under much different circumstances.

The defendant in Range, for instance, was never convicted of a felony. The crime at issue—making false statements in an application for food stamps—was classified as a misdemeanor under Pennsylvania law and only fell within the scope of § 922(g)(1) because it carried a possible sentence of up to five years' imprisonment.[5]  Range II, 69 F.4th at 98-99.  He was sentenced to probation and never served any time in prison.  Id.  The Third Circuit viewed this prior conviction as lacking the requisite severity to justify a deprivation of his right to keep and bear arms.  See id. at 102. ("We are confident that the Supreme Court's references to 'law abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer . . . protected by the Second Amendment").  This reasoning is entirely inapplicable to this defendant, who has twice been convicted of serious felonies.

The Range II opinion itself acknowledges that its holding is "narrow," limited only to the application of § 922(g)(1) against the petitioner.  Id. at 106.  It does not strike

---

[5] Section 922(g)(1) provides that anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" to possess a weapon or ammunition.  Because dishonesty on a food stamps application was punishable by up to five years' imprisonment, § 922(g)(1) prohibited the defendant in Range from owning a weapon.

down § 922(g)(1) as entirely unconstitutional, and leaves open the possibility that others convicted of more serious felonies could be stripped of their Second Amendment rights.  A concurring opinion authored by Judge Ambro adopts this same reading of the majority opinion, writing that "it speaks only to [Range's] situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like." Id. at 110. (Ambro, J., joined by Greenaway & Montgomery-Reeves, JJ., concurring).[6]

While non-binding in the Second Circuit, Range II's application of Bruen is also unpersuasive.  As noted by several of the concurring and dissenting judges, the majority's historical inquiry was much narrower than Bruen requires.  As pointed out by Judge Shwartz, the Range majority "disregards important aspects of Bruen," demanding that the government "identify a historical crime, including its punishment, that mirrors [the defendant's] conviction."  See id. at 114 (Shwartz, J., dissenting).  Bruen requires only "a well-established and representative historical *analogue*, not a historical *twin*," Bruen, 142 S. Ct. at 2111, and Range II's inquiry disregards many analogous examples that easily satisfy Bruen's burden.  See id. at 2133 ("analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check . . . even if a modern-day regulation is not a dead-ringer for historical precursors, it still may be analogous enough to pass constitutional muster.")  This reading of Bruen thus imposes an unworkable standard that has little basis in the text of the Bruen opinion as well as prior cases.  Importantly, at

---

[6] Judge Ambro also indicates that he reads the majority opinion as not disturbing the Heller safe harbor. See Range II, 2023 WL 3833404 at *11 (Ambro, J., concurring) (recognizing that felon dispossession remains "presumptively lawful").

least one post-Range District Court in this circuit has dismissed it in light of Bogle.  See

Hampton, 2023 WL 3934546, at *10-*13 & n.14.

      B.      Prohibitions on felon possession are consistent with the nation's history and
            tradition.

      Bruen replaced the once-popular means-end analysis utilized by many circuit

courts, including the Second Circuit, see Jimenez, 895 F.3d at 232, with a test that requires

the government to "affirmatively prove its firearms regulation is part of the historical

tradition that delimits the outer bounds of the right to keep and bear arms."  Bruen, 142 S. Ct.

at 2127.  In cases where the Second Amendment encompasses an individual's conduct, the

government bears the burden to "justify its regulation by demonstrating that it is consistent

with the Nation's historical tradition of firearms regulation."[7]  Id. at 2130.

      As to the scope of the inquiry, Bruen instructs that if a law is intended to

rectify a "general societal problem" dating back to the Founding-era, the government must

identify appropriate historical analogues that similarly burdens the right to armed self-

defense.  Id. at 2131-33.  The Bruen Court, as well as the Heller Court before it, both

considered a range of historical materials that focused on English history, American history

before and just after the Founding, as well as certain post-ratification processes into the early

nineteenth century.  See id. at 213; Heller, 554 U.S. at 595.  An examination of these

---

    [7] It is unclear that this historical analysis is even necessary for felon-in-possession
laws. Bruen requires the government to identify a reasonable comparable historical analogue
in an inquiry into "how and why the regulations burden a *law-abiding* citizen's right to
armed self-defense."  Bruen, 142 S. Ct. at 2133 (emphasis added).  By definition, because
felons do not abide by the law, felon-in-possession laws cannot burden the right of a *law-
abiding* citizen to keep and bear arms.  See Range I, 53 F.4th at 271-72.  Such an inquiry
would thus be unnecessary if felons are not part of the "people" protected by the Second
Amendment. See Range II, 69 F.4th at 114 (Shwartz, J., dissenting).

materials demonstrates that there is a significant number of close historical analogues for prohibiting felons from owning weapons.

1.  The text of the Second Amendment and its historical context do not grant convicted felons the right to keep and bear arms.

As discussed above, felons do not fall within the definition of "people" protected by the Second Amendment.  The Amendment's protections extend to "ordinary, law-abiding citizens," Bruen, 142 S. Ct. at 2134, who are entitled to be "members of the political community Heller, 554 U.S. at 580.  The right of convicted felons to keep and bears arms is not protected by the Second Amendment.  Jimenez, 895 F.3d at 238.

The same has been true throughout American history.  Congress and state legislatures have historically had wide latitude to exclude felons from the "political community" as a result of their convictions, and many of these restrictions have been matters of settled law for decades.  For instance, many felons lose their right to serve on a jury, receive government benefits, hold public office, travel freely, or even the right to vote.  See, e.g., Richardson v. Ramirez, 418 U.S. 24 (1974) (upholding the disenfranchisement of felons).  The prohibition on felony possession fits squarely within this vein of acceptable collateral consequences for convicted felons.  Because the defendant is not a "law-abiding citizen" and has "demonstrated disrespect for legal norms of society," she does not enjoy the protections of the Second Amendment.  See Jackson, 69 F.4th at 504.

2.  Felon disarmament is well-supported by a long tradition of disarming certain individuals viewed as threats to the public order.

There is ample historical evidence for disarming individuals viewed as threats to public order and stability.  While the defendant concludes otherwise, much of her analysis fails to properly embody the historical inquiry required by Bruen.  Instead of analyzing the

record within the historical context, she searches instead for a direct replica of § 922(g)(1) from the Founding era.  But <u>Bruen</u> does not require a replica—the government only needs to "identify a well-established and representative historical *analogue*, not a historical *twin*," <u>Bruen</u>, 142 S. Ct. at 2111.  The defendant's inquiry is far too narrow, attempting to define "historical analogue" in a manner so restrictive that that no example could possibly meet it.

For instance, the defendant's Motion claims that historians have been unable to locate any laws prohibiting felon possession, and that "none exist," as evidence of a historical tradition that lacks an appropriate analogue for § 922(g)(1).  Def.'s Mot. 15-16. Even assuming the accuracy of this statement, "felony," as it is commonly understood today, is a relatively recent innovation and was certainly understood differently at the time of the founding.  William Blackstone defined "felony" as "an offense which occasions a total forfeiture of either lands, or goods, or both, at the common law, and to which capital or other punishment may be superadded, according to the level of guilt."  <u>See</u> 4 William Blackstone, <u>Commentaries on the Laws of England</u> 95 (Harper ed. 1854).  As modern criminal codes did not yet exist, courts instead relied on traditional common-law principles, and punishment was often swift and harsh. "[T]he standard penalty for such crimes" was capital punishment, even for some offenses that seem relatively minor today.  <u>Baze v. Reese</u>, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (citation omitted).  As modern, long-term prison facilities did not develop until much later, today's understanding of "felony" as a specific and clearly delineated category of crimes makes little sense in the historical context.[8]

---

[8] The understanding of "felony" changed over time, generally as officials gained more flexibility in their ability to punish criminals.  By the mid-nineteenth century, "felony" grew to encompass both traditional common-law felonies plus additional crimes designated as

Accordingly, the concept of banning felons from possessing firearms would have been by viewed as redundant by early Americans.[9]  Disarmament is inherent in crimes punished by death or total forfeiture, and it is hard to imagine that felon dispossession would have been viewed as an impermissible punishment for a crime, given the regularity with which much harsher sentences were doled out.  See Medina, 913 F.3d at 158-59 ("it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms"); Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms . . . We may presume that persons confined in gaols awaiting trial on criminal charges were also disbarred from the possession of arms . . . .").

The defendant's inquiry is far too narrow.  Bruen requires only a "well-established and representative historical *analogue*, not a historical *twin*," and the routine forfeiture of property, including arms, from felons certainly fits the bill.[10] The defendant

---

felonies by statute.  See Will Tress, Unintended Collateral Consequences, 57 Cleveland State L. Rev. 461, 464-65 (2009) (recounting the historical understanding of felonies); Medina 913 F.3d at 158 (discussing the evolution of common-law felonies and the disappearance of forfeiture as punishment for serious crimes).

[9] Because criminal codes are themselves a relatively modern innovation, the defendant's search for "Founding-era felon-disarmament laws" must take account of the common-law context of the early-American legal system.  See Saul Cornell, Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 501 (2004) ("To properly understand how [early] American law dealt with firearms, one must . . . reconstruct the neglected context of the common-law . . . .").

[10] As mentioned previously, Bruen requires the government to identify a historical analogue that impose a comparable burden on a "law-abiding citizen's right to armed self

16

searches for a historical twin, looking only for a Founding-era replica of § 922(g)(1) and ignoring all reasonably analogous regulations.  Notwithstanding the lack of necessity for such laws, the power certainly existed in the early United States to ban felons from owning weapons, as the defendant herself seems to acknowledge.  See Def.'s Mot. at 18 (acknowledging that "state legislatures had the power to disarm people with felony convictions").

      Thus, the Bruen inquiry with regards to § 922(g)(1) ought to focus instead on the broad history of disarmament of individuals who were viewed as general threats to the public order.  There are many examples of this in both English and early American history.

      The "predecessor to our Second Amendment" was the 1689 English Bill of Rights, which protected the right to bear arms.  Bruen, 142 S. Ct. at 2141 (quoting Heller 554 U.S. at 593).  Parliament enacted the Bill of Rights in 1689 and around the same time enacted a number of additional regulations on the possession of weapons.  This included outright bans for members of certain groups, indicating that the text of the English Bill of Rights did not prohibit certain forms of dispossession.  In the midst of religious tension, for example, the Crown banned practicing Catholics from "hav[ing] or keep[ing]" any kind of "Arms[,] Weapons[,] Gunpowder[,] or Ammunition" without special permission.  See 1 W. & M., Sess. 1, c.15, in 6 The Statutes of the Realm 71-73 (1688).  The provision reflected Parliament's view that this group would have disrespect for and disobedience to the Crown and applied to all Catholics, regardless of any risk of violence.  See Range II, 69 F.4th at

---

defense." Bruen, 142 S. Ct. at 2133.  As property forfeiture includes the seizure of arms, it certainly imposed as great a burden on the right to keep and bear arms.

120-22 (Krause, J., dissenting) (providing additional context).  In enacting § 922(g)(1),

Congress employed similar reasoning, disarming "persons who have demonstrated disrespect

for legal norms of society." Jackson, 69 F.4th at 504.

   In the United States, early legislatures passed laws that criminalized gun

possession by those whose actions demonstrated a disrespect for the law, a step viewed as

necessary to protect "an orderly society and compliance with its legal norms."  Jackson, 69

F.4th at 503 (quoting Range I, 53 F.4th at 281-82).  During the Revolution, for example, the

Continental Congress recommended that state governments disarm individuals with

questionable loyalty to the United States, a call that was heralded by the legislatures of

several of the original thirteen states.  1 Journals of the Continental Congress, 1774-1778,

285 (1906); see Joseph Greenlee, The Historical Justification for Prohibiting Dangerous

People from Possessing Arms, 20 Wyo. L. Rev. 249, 262-65 (2020) (discussing in detail the

seizure of arms from Revolutionary-era Loyalists in several colonies).  Dispossession was

also imposed as penalty for relatively minor offenses, such as hunting illegally, by early state

legislatures.  See Act of Apr. 20, 1745, ch. III, 23 The State Records of North Carolina 218-

19 (1904); see also Jackson, 69 F.4th at 503, 505 (discussing other examples).

   In addition, many of the debates surrounding the ratification of the

Constitution also illustrate that early Americans believed that potentially dangerous

individuals forfeited their right to keep and bear arms.  The famous minority report from the

Pennsylvania delegation—later viewed by the Heller Court as "highly influential" in the final

language of the Second Amendment, 554 U.S. at 604—stated that the government cannot

infringe one's right to keep and bear arms, "*unless for crimes committed*, or real danger of

public injury from individuals." Jackson, 69 F.4th, at 503 (emphasis added).  This

demonstrates that "members of the Founding generation viewed [c]rimes committed—
violent or not—[as] . . . an independent ground for exclusion from the right to keep and bear
arms." Binderup v. Att'y Gen. United States, 836 F.3d 336, 349 (3d Cir. 2016); see also N.Y.
State Rifle & Pistol, 140 S. Ct. at 1540-41 (Alito, J., joined by Thomas & Gorsuch, JJ.,
dissenting) (recognizing that "history supported the constitutionality of some laws limiting
the right to possess a firearm, such as laws banning firearms from certain sensitive locations
and prohibiting possession by felons and other dangerous individuals").

   As these laws—for better or worse—sought to disarm individuals viewed as
threats to the public order, they are comparable to § 922(g)(1)'s prohibition on felon
possession.  While the changing understanding of felonies over time make a historical
duplicate impossible to cite, Bruen requires only a "comparable tradition of regulation" that
"impose[s] a comparable burden" to Second Amendment rights.  Bruen, 142 S. Ct. at 2131-
33.  Because early-American legislatures possessed and routinely utilized the power to ban
certain groups from owning weapons, § 922(g)(1)'s prohibition on felon possession is
"analogous" to historical examples, Jackson, 69 F.4th, at 504, and clearly passes
constitutional muster.  Courts that have undergone extensive historical inquiries have
concluded the same.  See, e.g., United States v. Rowson, 2023 WL 431037, at *17 (S.D.N.Y.
Jan. 26, 2023) (explaining that "post-Bruen decisions addressing the federal felon-in-
possession statute" have "uniformly up[held] that statute . . . "); United States v. Ware, 2023
WL 3568606 (S.D. Ill. May 19, 2023) (finding consistency with history and tradition);
Campiti v. Garland, 2023 WL 143173, at *4 (D. Conn. Jan. 10, 2023) (same); Jackson, 69
F.4th at 503-05 (same).

The lone outlier is the Third Circuit in <u>Range II</u>, which narrowly found that § 922(g)(1)'s application to the defendant in that case violated his Second Amendment rights.  <u>See Range II</u>, 69 F.4th at 105-06.  The court there concluded that there was no historical analogue for the disarmament of individuals convicted of minor offenses, and thus the application of § 922(g)(1) to <u>Range</u> was unconstitutional.  This analysis, however, does not extend to the defendant for many of the reasons discussed above.  For example, unlike in <u>Range</u>, this defendant was convicted of several serious felonies and has served lengthy prison sentences—the threat she poses to the public safety is evident.

The only post-<u>Bruen</u> circuit to review § 922(g)(1) as applied to an individual convicted of more serious crimes was the Eighth Circuit in <u>Jackson</u>, which examined the historical record and found ample support for felon dispossession.  There, the defendant had been convicted of multiple felonies and served a lengthy prison sentence.  <u>See id.</u> at 498.  Because of the serious nature of his prior convictions, the Eighth Circuit's reasoning in <u>Jackson</u> is certainly more analogous to the present case than the narrow holding in <u>Range II</u>.  In fact, the case appears to be an aberration in an otherwise consistent line of jurisprudence—as far as the government is aware, no court in the country prior to <u>Range II</u> had found any application of § 922(g)(1) as unconstitutional, despite countless opportunities to do so.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should deny the Motion.

Dated:     Brooklyn, New York
           June 22, 2023

                                        Respectfully submitted,


                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        Attorney for Plaintiff
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                             By:     <u>/s/ Andres Palacio</u>
                                        F. Turner Buford
                                        Andres Palacio
                                        Assistant United States Attorneys
                                        (718) 254-7000

cc:        Allegra Glashausser, Esq. (by E-mail and ECF)